IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Axoniq B.V.,<br>*Plaintiff*,<br>v.<br>Thermo Fisher Scientific Inc.,<br>*Defendant*. | Case No. 26-cv-10386<br>**COMPLAINT**<br>**Jury Trial Demanded** |

Plaintiff Axoniq B.V. ("Axoniq") hereby brings this Complaint against Defendant Thermo Fisher Scientific Inc. ("Thermo Fisher") for copyright infringement, violations of the Digital Millennium Copyright Act, breach of contract, and related claims and alleges as follows:

## NATURE OF THIS ACTION

1. This action arises out of Thermo Fisher's deliberate and calculated campaign to circumvent the licensing restrictions on Axoniq's proprietary software applications outside of the fourteen-day evaluation period, avoid paying licensing fees it was on notice of, and unlawfully exploit Axoniq's protected and copyrighted software in commercial applications for its own gain.

2. Axoniq makes software tools that help businesses build computer systems with a perfect memory. These systems keep a permanent, step-by-step record of everything that happens in them, instead of keeping only the latest snapshot. Most business software works like a whiteboard. Axoniq's approach is

closer to a bank ledger—every change is written down as a new entry and never erased. The technical name for this process is "event sourcing."

3. Axoniq's event sourcing structure provides built-in audit trails and accountability for AI. It also lowers risk for a company, as every decision can be traced, tested, and undone. Typical uses for the Axoniq applications include payments, supply-chain tracking, order and inventory management, government case management, and customer identity checks.

4. Axoniq helps its customers build smart, scalable tools for seamless event sourcing that is auditable, and its value is widely recognized as evidenced by over 100 million downloads of the Axoniq products by more than 65,000 companies.

5. Within Axoniq's suite of products, the three relevant here are:

> *Axon Framework.* A free, open-source starter kit for programmers. The Axon Framework gives developers ready-made building blocks, so they don't have to write the record-keeping machinery themselves.

> *Axoniq Framework.* The paid, business-grade version of the framework. It adds features that large organizations need, such as recovering from failures, connecting to other common business systems, privacy tools, and commercial support.

> *Axon Server.* The secure filing cabinet, or "system of record," where every business event is stored. It also delivers messages between the different parts of a system, and it is designed to perform well on a large scale.

6. The Axon Framework can be downloaded for free and is accessible to the public without a license. For users that want expanded functionality, Axoniq offers a fourteen-day evaluation period for its subscription-level applications (Axoniq Framework and Axon Server), to be used only in a development environment (*i.e.*,

internal only and not customer-facing), so that potential clients can interact with the software before committing to a long-term license.

7. Thermo Fisher—one of the largest life-sciences tools and services companies in the world—exploited this system. On information and belief, Thermo Fisher has downloaded Axoniq software thousands of times, has repeatedly connected to and interacted with the proprietary Axon Server and its dashboard, and has incorporated Axoniq's software into its Genexus Max platform ("Genexus"), which uses CQRS and event sourcing to decouple read/write workloads and improve scalability of sequencing pipelines in commercial environments, all without a paying a single dollar in licensing fees. On information and belief, this scheme involved a calculated process of exploiting Axoniq's evaluation period for its proprietary software to gain unauthorized access to the functionality of the Axon Products, which are available for commercial use only to paying licensees. Indeed, Thermo Fisher's Axon Server instances are logged in Axoniq's backend system as having no license ("licenseType=null"), as recently as in September 2026.

8. Since March 2026, Axoniq has written to at least eight Thermo Fisher representatives, through both Axoniq's business executives and its outside counsel—each time explaining that use of Axon Server beyond the fourteen-day evaluation window requires a commercial license. Thermo Fisher ignored every business-level communication.

9. Thermo Fisher's silence forced Axoniq to reach out to its legal department, who confirmed that Thermo Fisher did see Axoniq products on its side

but needed additional information to confirm the nature of the use—information only Thermo Fisher has access to. Throughout these discussions, Thermo Fisher never denied using Axoniq's software in its Genexus platform.

10. Thermo Fisher's refusal to stop exploiting Axoniq's intellectual property has left Axoniq with no choice but to bring claims for copyright infringement, violations of the Digital Millennium Copyright Act, breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, and unfair competition. Thermo Fisher's persistent, knowing, and unauthorized use of the Axon Products in ways that are expressly forbidden under Axoniq's Terms of Service has caused—and unless enjoined by this Court, will continue to cause—irreparable harm to Axoniq. Axoniq seeks permanent injunctive relief to put an end to Thermo Fisher's unauthorized use, as well as actual damages, liquidated damages under its Terms of Service, statutory damages, and attorneys' fees and costs.

## THE PARTIES

11. Plaintiff Axoniq B.V. is a Dutch Besloten Vennootschap, similar to a private limited liability company, with its statutory seat in Amsterdam and its primary offices at Lange Viestraat 2b, 3511 BK Utrecht, The Netherlands.

12. Defendant Thermo Fisher Scientific Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 168 Third Avenue, Waltham, Massachusetts 02451. Thermo Fisher Scientific Inc. can be reached with service of process through its registered agent in the State of New York, Capital Services, Inc. at 1218 Central Avenue, Suite 100, Albany, New York 12205.

## JURISDICTION AND VENUE

13. This action arises under the Copyright Act of 1976, 17 U.S.C. § 101, *et seq*., and the Digital Millennium Copyright Act, 17 U.S.C. § 1201, *et seq*.

14. This Court therefore has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1338. Separately, the Court has jurisdiction pursuant to 28 U.S.C. § 1332, because there is complete diversity between the parties and the amount in controversy exceeds $75,000. This Court also has supplemental jurisdiction over state-law claims pursuant to 28 U.S.C. § 1367 because those claims arise out of a common nucleus of operative fact with the federal claims, namely, Thermo Fisher's unauthorized use of Axoniq's copyrighted software applications.

15. This Court has personal jurisdiction over Thermo Fisher, and venue is proper in this District, due to a valid and enforceable forum selection clause in Axoniq's Terms of Service. Both the 2025 and 2026 versions of Axoniq's Terms of Service, which Thermo Fisher agreed to through the use of Axoniq's website, creation of an account, and/or upon download or installation of Axoniq's software, provide that, "[f]or customers domiciled in the United States of America or Canada," "[a]ll disputes, claims or controversies arising out of or relating to this Agreement that are not resolved by the parties' good faith attempt to negotiate a resolution will be submitted as follows: if U.S. federal jurisdiction exists, the parties consent to exclusive jurisdiction and venue in the federal courts located in New York County, New York." Exhibit A, Governing Law and Dispute Resolution; Exhibit B § 26. Thermo Fisher is domiciled in the United States, and, as alleged below, Axoniq attempted in good faith for months to negotiate a resolution before filing this action.

16. The 2025 and 2026 Terms of Service further provide that, for customers domiciled in the United States, the agreement "will be governed by and construed in accordance with the laws of the state of New York, USA, regardless of conflict of laws principles." Exhibit A, Governing Law and Dispute Resolution; Exhibit B § 26.

17. The Court further has personal jurisdiction over Thermo Fisher because, among other things, upon information and belief, Thermo Fisher has purposefully availed itself of the benefits of doing business in this District, including by marketing, selling, and supporting products and services, such as its Genexus platforms, to customers located throughout this District.

18. Additionally, venue over Axoniq's claim of copyright infringement is proper in this District not only by consent, due to the valid and enforceable forum selection clause in the Terms of Service, but also pursuant to 28 U.S.C. § 1400 because Thermo Fisher "may be found" in this District in that it is subject to personal jurisdiction in this District.

## <u>FACTUAL BACKGROUND</u>

### Overview of the Products Axoniq Offers

19. When a standard computer program or an AI agent makes a choice (*e.g.*, approving a loan, processing a payment, or recording a laboratory result), it typically saves only the final result and deletes the steps it took to make the decision. Axoniq changes that process using a method called event sourcing.

20. Axoniq gives software engineers ready-made frameworks, such as the subscription-level "Axoniq Framework," to easily build massive, fast software

applications that make complex architectures transparent and explainable and that won't break as the company grows.

21. Axoniq also offers the Axon Server to paid licensees—a zero-configuration message router and event store designed to support the Axoniq Framework by acting as a centralized backbone for handling persistent event storage and real-time message routing. The Axoniq Framework provides the programming model and messaging abstractions (*i.e.*, commands, events, and queries), while the Axon Server provides the infrastructure and runtime engine to power the framework.

22. The Axoniq Framework coupled with the Axon Server (collectively, the "Axon Products") offer significant additional functionality that goes beyond what is publicly available in Axoniq's open-source software—the Axon Framework.

23. Axoniq's website and documentation make clear that the subscription-level ***Axoniq*** Framework software is different from the open-source ***Axon*** Framework software. The Axoniq Framework may be used for evaluation and development for a period of 14-days without a paid license; however, using the framework beyond that trial period or for any commercial purpose requires a commercial license.[1] Axoniq's website, consistent with its longstanding license documentation in place since 2017, states clearly that any download of the premium ***Axoniq*** Framework is subject to *one* rule—it may not be used in a commercial environment.

[1] This 14-day trial period has been in place since Axoniq's implementation of the 2025 Terms of Service.


The model

One rule: production use is the boundary

The Maven and GitHub namespaces are the signal. org.axonframework is Apache 2.0, always. io.axoniq is commercial. A developer reading our licensing should be able to determine their obligations in one sentence, without caveats.

Read our full licensing terms

| | Axon Framework | Axoniq Framework |
|---|---|---|
| License | Apache 2.0 | Commercial |
| Production use | ✓ Free | Requires commercial license |
| Evaluation + dev | ✓ Free | ✓ Free |
| Namespace | org.axonframework | io.axoniq.framework |

https://www.axoniq.io/open-source. Further, Axoniq's website notes in the above chart that the Axon Framework can be downloaded from an open-source library under the name "org.axonframework" but the subscription-level software (referred to as "io.axoniq.framework") is only available through a commercial license.

## Axoniq's Foreign Copyrights

24. From the time that the Axon Products were first fixed in a written medium in or around 2017, the source code for each of the applications has been protected by foreign copyright law as a literary work. Axoniq's foreign copyrights are further evidenced and enforced by the licensing terms and restrictions on use under the Terms of Service, as discussed in further detail below.

25. According to the Dutch Copyright Law, or *Auteurswet*, a Dutch copyright is the exclusive right of the author of a work and comes into existence as soon as the work is made. Axoniq is the original author of the Axon Products' source codes and

therefore owns the copyright of the same, which are considered protectable literary works under Dutch law, where these source codes were first published.

26. The Netherlands is a member of the Berne Convention, as is the United States, and thus Axoniq is not required to register its foreign copyrights in the United States before seeking redress for infringement of its works. *See MPD Accessories B.V. v. Urban Outfitters*, 2014 WL 2440683, at *11 (S.D.N.Y. May 30, 2014) (granting infringement claims and assessing damages in favor of Dutch copyright owner).

**Getting Access to the Axon Products**

27. In order to access any of the copyrighted, subscription-level Axon Products through Axoniq's website, a user must first create an account with Axoniq, which employs a "clickwrap" agreement that requires the user's acceptance of the Axoniq Terms of Service on behalf of the user himself and his company, as a precondition to creating an account to access the Axon Products.



The "Axoniq Terms of Service" link shown above links to the Terms of Service. A true and correct copy of the current Terms of Service, dated as of April 22, 2026 (the "2026 TOS"), is attached hereto as Exhibit A and incorporated herein by reference.

28. When a user creates an account on Axoniq's website, they are taken to Axoniq's suite of products.




29. The software download page on Axoniq's website illustrates the two categories of software offered by Axoniq: (1) paid applications that require a license for commercial use (Axoniq Framework, Axon Server, Platform Client, and Axoniq Insights), and (2) an open-source application that is available to the public (Axon Framework).

30. When a registered user downloads an application, for example the Axon Server, the ZIP file containing the application also includes a text file entitled

"README.txt," which again references the Terms of Service and reminds the user of the 14-day evaluation period and use limitations for the application. If a potential customer downloads Axoniq's software from another available platform separate from Axoniq's website, such as Maven, the downloaded files similarly include the "README.txt" file that alerts the user of the enforceable Terms of Service.

```
This is the Axon Server distribution.

For information about the Axon Framework and Axon Server,
visit https://docs.axoniq.io.

License Summary
----------------

Axon Server is licensed under the Terms of Service
(https://www.axoniq.io/legal/terms-of-service).

You may not use this software except in compliance with these terms.
Permitted use of the software: only for evaluation purposes and deployment not
exceeding 14 days. See the Terms of Service for the specific language governing
permissions and limitations.

No support is provided, and the software comes "AS IS" without warranty.

⚠ IMPORTANT: continued deployment after 14 days requires a commercial license. Go
to https://www.axoniq.io for details.

For licensing information and to register, visit: https://www.axoniq.io/pricing
```

31. In order to access the Axon Products, individuals at Thermo Fisher either created an account on Axoniq's website or downloaded software containing the "README.txt" file, and therefore agreed in both cases to be bound by Axoniq's Terms of Service. Thermo Fisher's users were reminded of the Terms of Service with every software download that contained the "README.txt" file and chose to disregard them each time.

**Axoniq's Current Terms of Service**

32. The 2026 TOS took effect on April 22, 2026, and were in effect when Axoniq's counsel wrote to Thermo Fisher's legal department in August and September 2026.

33. The opening paragraph of the 2026 TOS clearly states as follows:

> If You wish to access and/or or use the Services on behalf or for the benefit of your employer, by accepting these Terms **You do so on Your own behalf as well as that of Your employer**, and You warrant and represent that You have authority to do so. **You acknowledge that You have read these Terms, understand them, and agree to be bound by them.** If You do not agree to any of the terms below, AXONIQ is unwilling to provide or license the Services to You, You are not authorized to access or use them for any purpose . . . .

Exhibit A, p. 1 (emphasis added).

34. Among other provisions, Section 1.4 sets forth the various types of use licenses for the Axon Products:

> AXONIQ offers four types of use licenses: Unregistered, Development, Pre-Production and Production. Unregistered users may use the Software for trial purposes for **no more than 14 calendar days** from the date of first download. **Any use beyond this period requires LICENSEE** to register on the Platform and sign up for the appropriate Plan.

Exhibit A, p. 8 (emphasis added).

35. Pursuant to Section 3 of the 2026 TOS, any use of the software under an Unregistered License is "solely for evaluation purposes for a limited duration of 14-days starting from the day of first download." Section 3 also explicitly prohibits mirroring and distribution or access by multiple users or systems:

> Automated local caching of Software artifacts by standard build and container tools (such as Maven local repository caching or Docker image caching) solely for the personal use of an individual developer on their own machine is permitted without a separate license. All other Mirroring, including replication to any shared, hosted, or organization-wide artifact repository (such as JFrog Artifactory, Sonatype Nexus, or similar systems) for distribution or access by multiple users or systems, is strictly prohibited without a license as indicated on Axoniq's pricing page.

Exhibit A, pp. 9–10.

36. Section 3 of the 2026 TOS further prohibits embedding: "Licensee may not bundle, integrate, or embed the Software into any product, service, or solution offered to third parties—whether hosted, managed, or distributed—without a separate Embedded License Agreement with Axoniq," and "'embedding' includes any deployment in which the Software operates as a component of a commercial offering made available to End Users or customers of Licensee." Exhibit A § 3.

37. The 2026 TOS also provides that an Unregistered License "terminates automatically upon exceeding 14 days of use," upon which "all rights to use the Software across your organization immediately cease, and you must delete all copies of the Software from all systems and locations within your organization." Exhibit A § 13(a-1). Section 4(b) further prohibits licensees from "work[ing] around any technical limitations in the Services or hack[ing] the license enforcement mechanism and/or circumvent[ing] the limitations on use of the Services," and from making "more copies of the Services than as allowed in this Agreement." Exhibit A § 4(b).

38. Section 15.4 provides explicit remedies for non-compliance with the terms, including:

> (i) all applicable commercial license fees for LICENSEE's actual use or actual size tier, at AXONIQ's then-current pricing, retroactive to the date of first non-compliant use or, for Size Criteria, the earlier of the date LICENSEE first exceeded the reported Size Criteria or the beginning of the current Order term; (ii) liquidated damages equal to three times (3x) such fees; (iii) interest at 1.5% per month on all amounts outstanding; and (iv) AXONIQ's reasonable attorneys' fees and costs of enforcement.

Exhibit A, pp. 22–23.

39. Section 15 also requires a licensee, upon Axoniq's written request, to certify its compliance within thirty days (fifteen days for Unregistered Licenses), and permits Axoniq to audit a licensee's use where it "reasonably believes that LICENSEE has breached any license terms." Exhibit A §§ 15.1–15.2. The 2026 TOS further authorizes Axoniq to process data about a licensee's use of the Services "to analyze usage and license compliance." Exhibit A § 18(d). Axoniq's review of Thermo Fisher's usage data, as described below, constitutes such an audit and revealed that Thermo Fisher is using the Software in violation of the 2026 TOS.

**Axoniq's Prior Terms of Service**

40. Axoniq periodically updates the Terms of Service, which is explicitly allowed and provided for in the Terms of Service themselves.

41. Prior to April 22, 2026, the October 2025 Terms of Service (the "2025 TOS") governed. A true and correct copy of the 2025 TOS is attached hereto as Exhibit B and incorporated herein by reference.

42. The 2025 TOS was in effect when certain of Thermo Fisher's downloads of Axoniq's copyrighted software occurred in October 2025 and when Axoniq served its March 11 Notice (as defined below) on Thermo Fisher.

43. The 2025 TOS was largely similar to the current terms and explicitly prohibited commercial use without a paid license, including "any use that directly supports business operations." Exhibit B, Definitions ("Non-Production Purposes"). The 2025 TOS also provided that, for Axon Server Single Node, the free license "is valid only for deployments lasting 14 days or less. Any deployment exceeding 14 days requires a commercial license." Exhibit B § 3. The license "terminates automatically upon exceeding 14 days of continuous operation," after which "all rights to use the Software across your organization immediately cease." Exhibit B § 13(a-1). And, like the 2026 TOS, the 2025 TOS prohibited working around technical limitations or circumventing the license enforcement mechanism. Exhibit B § 4(b).

44. Similar to the 2026 TOS, the 2025 TOS also informed users that:

> Unauthorized production use of Software licensed under Non-Production Free License may result in: (i) immediate liability for all applicable commercial license fees for the type of license AXONIQ deems appropriate at its discretion, from first unauthorized use; (ii) liquidated damages equal to 3x such license fees; (iii) interest at 1.5% per month; and (iv) reasonable attorneys' fees and costs of enforcement.

Exhibit B § 15a(c).

45. Finally, the 2025 TOS also explicitly informed users that the terms were subject to change: "These Terms may be modified from time to time, which modified versions will be notified on our portals and/or by e-mail and Your access to the

Services is subject to Your continuing agreement to these Terms, as they may be amended from time to time." Exhibit B, p. 1.

46. Prior to October 2025, use of the Axon Products was governed by the Axoniq Open Source License Agreement ("License Agreement").[2] A true and correct copy of the License Agreement is attached hereto as Exhibit C and incorporated by reference herein. Thermo Fisher first began using the Axon Products in or around 2021, at which time, it received a copy of the License Agreement with each copy it obtained of Axoniq software, in the form of a file titled "LICENSE.txt." This License Agreement granted the user "at no charge," a non-exclusive, royalty-free license to install and use the Axoniq software in object code "***solely for your internal business operations***." Exhibit C § 1.7(i) (emphasis added). It prohibits licensees from copying or using the Software except as expressly permitted, and from "circumvent[ing] the limitations on use of AxonIQ Software provided to you in Object Code format that are imposed or preserved by any License Key." Exhibit C § 2.2. It also prohibits use of any derivative work of the commercial software "outside of a Non-production Environment, in any production capacity, on a temporary or permanent basis." Exhibit C § 3.2. The License Agreement is non-assignable without Axoniq's prior written consent. Exhibit C § 9.7.

[2] The License Agreement is different from the "Apache 2.0" license, which applies to the Axon Framework application, which is free for public use. Despite the use of the phrase "open source," the License Agreement contains important limitations and copyright protections that are detailed therein.

47. Upon information and belief, each copy of the Axon Products that Thermo Fisher obtained before October 2025 included a copy of the License Agreement. Axoniq's records show that Thermo Fisher has been running Axon Framework versions 4.12.x and 4.13.x and connected applications on Axon Server version 4 or earlier. Thermo Fisher's use of those copies in its Genexus platform and in support of its business operations with customers exceeded the License Agreement's limitation to "internal business operations."

**Evidence of Thermo Fisher's Unlicensed Use of the Axon Products**

48. For nearly six years, Thermo Fisher has been exploiting the Axon Products in a customer-facing environment (*i.e.*, outside of an "internal business environment")—without ever paying for a commercial license.

49. Axoniq uses industry-standard identity-resolution and software-adoption intelligence tools, including those provided by Scarf, a third-party open-source intelligence platform, to connect package downloads, documentation visits, and commercial product telemetry to the companies behind that activity.

50. Axoniq's records reflect Thermo Fisher activity involving Axoniq's products dating back to at least March 28, 2021, and the Scarf report attributing Axon Server use to Thermo Fisher carries a confidence score of 0.986.

51. Between October 17, 2025 and August 3, 2026 alone, Axoniq's telemetry recorded 2,872 download and usage events attributed to Thermo Fisher's corporate domain, thermofisher.com, all originating from business connections. These events include, among others: (a) 1,538 downloads through Axoniq's "Get AxonIQ" distribution channel; (b) 60 downloads of the proprietary "io.axoniq/axonserver-

connector-java" component, which connects applications to Axon Server; (c) downloads of the subscription-level "io.axoniq.framework" components, including "axoniq-framework," "axoniq-framework-spring," "axoniq-spring-boot-starter," "axon-server-connector," and "axoniq-testcontainer"; and (d) 46 separate interactions with the Axon Server Dashboard between January 28, 2026 and July 23, 2026.

52. Thermo Fisher's use did not stop when Axoniq demanded that it obtain a license in March 2026. Between July 8, 2026 and October 5, 2026, Axoniq's telemetry recorded an additional 826 events attributed to Thermo Fisher, including Axon Server instances running version 2025.2.6 that reported to Axoniq's update service with no license ("licenseType=null") on repeated occasions in July and September 2026, most recently on September 25, 2026—months after the fourteen-day evaluation period had expired and after Thermo Fisher's legal department had received Axoniq's counsel's letter.

53. Upon information and belief, Thermo Fisher has incorporated Axoniq's software into its Genexus platform, a commercial product that Thermo Fisher markets and sells to customers, and uses the Axon Products in connection with business operations and customer-facing systems—uses that are expressly excluded from any free, non-production, or evaluation license under both the 2025 TOS and the 2026 TOS.

54. Upon information and belief, Thermo Fisher has also obtained unlicensed copies of Axoniq's proprietary software through build and dependency-management tools, including Maven-type artifact repositories, in a manner that

results in replication of the software across multiple users and systems within Thermo Fisher's organization, in violation of Section 3 of the 2026 TOS.

**Axoniq's Repeated Notices to Thermo Fisher**

55. Axoniq first reached out to Thermo Fisher personnel about the Axon Framework and Axon Server in April and May 2021, offering training, demonstrations, and information regarding Axoniq's subscription-level products. However, Thermo Fisher never purchased a license at that time, or at any time since.

56. On March 11, 2026, Axoniq's Audit & Compliance team sent a written notification entitled "NOTIFICATION Axon Server Licensing — Action Required Before March 20" (the "March 11 Notice") to five Thermo Fisher representatives: Janet Chilcott, Jitesh Kakarea, Lars Dornburg, Valeria Tanaka, and Vikas Rathi. The March 11 Notice informed Thermo Fisher that Axoniq had revised its Terms of Service in October 2025; that Axon Server is a proprietary product; that "Axon Server Single Node includes a 14-day free evaluation period" and "[a]ny use beyond that — across production, development, staging, or any other environment — requires a commercial license"; and that Axoniq's "records indicate your organization is currently running Axon Server beyond that window." The March 11 Notice requested a response before March 20, 2026.

57. On March 18, 2026, Axoniq's Audit & Compliance team followed up with each of the same five Thermo Fisher representatives, warning that "[t]o avoid any disruption to your services or further action to protect Axoniq's intellectual property, we need you to contact us before March 20, 2026." On or about March 17-18, 2026,

Axoniq's Chief Executive Officer, Jessica Reeves, also personally forwarded the March 11 Notice to Ms. Chilcott.

58. Thermo Fisher did not respond. On March 24, 2026, Ms. Reeves wrote personally to each of the five Thermo Fisher representatives, explaining that Thermo Fisher's connected applications "are also running without a commercial license" and offering to share Axoniq's usage records. Again, Thermo Fisher did not respond.

59. On June 29 and June 30, 2026, Axoniq Account Executive Ivo Lima wrote to Thermo Fisher engineers Mayank Tiwari and Ryan Snyder. Mr. Lima noted that Thermo Fisher's team had downloaded Axoniq software "more than 2,500 times in the last 12 months," that the software was "powering parts of the Genexus Max platform at Thermo Fisher," that Thermo Fisher was testing the Axon Server connector, and that "use of Axon Server requires a commercial license." Thermo Fisher did not respond.

60. Having exhausted its business-level outreach, Axoniq engaged outside counsel, who on August 7, 2026 sent a letter to Seth Appiah-Opoku, Associate Corporate Counsel at Thermo Fisher (the "August 7 Letter"). The August 7 Letter explained that Axon Server requires a paid license under Section 1.4 of the Terms of Service, that organizations of Thermo Fisher's size are required to purchase an Enterprise License, and that Thermo Fisher had downloaded Axon products over 2,800 times in the preceding ten months. The August 7 Letter enclosed Axoniq's telemetry report and estimated that an appropriate license for Thermo Fisher's use would be approximately $600,000 per year over a three-year term.

61. In contrast to the prior lack of response from Thermo Fisher's business team, on August 10, 2026, Thermo Fisher's counsel responded that they were "unfamiliar with this matter" and requested a copy of the March 11 Notice and the names of the Thermo Fisher representatives Axoniq had contacted. Axoniq's counsel provided both the same day, identifying Janet Chilcott, Jitesh Kakarea, Lars Dornburg, Mayank Tiwari, Rajkiran Vajreshwari, Ryan Snyder, Valeria Tanaka, and Vikas Rathi.

62. Thermo Fisher then went silent again. Axoniq's counsel followed up on August 27, 2026, and on September 2, 2026, requesting "the courtesy of a response." On September 24, 2026, Mr. Appiah-Opoku stated only that "[t]he matter was escalated internally and is under review."

63. When the undersigned counsel got involved in October 2026, Thermo Fisher asked for technical data showing its usage. Axoniq provided evidence showing the unlicensed use of its software in violation of the Terms of Service. Upon receiving this evidence, Thermo Fisher asked for additional information that Axoniq does not have access to as it does not have visibility into Thermo Fisher's servers. Notably, Thermo Fisher never denied the veracity of Axoniq's records, nor that Axoniq's products were incorporated into Thermo Fisher's commercial Genexus platform. However, license negotiations stalled and the parties were unable to resolve the copyright claims at issue in this action.

64. To this day, despite repeated attempts to negotiate a license and Axoniq's clear requests to cease infringing use, Thermo Fisher continues to download

and use the Axon Products without a license and without payment, with full knowledge that this use violates Axoniq's Terms of Service and infringes Axoniq's copyrights.

. . .

65. Given the extent, duration, and magnitude of Thermo Fisher's willful infringement, Axoniq has been compelled to file this action to protect its intellectual property rights against Thermo Fisher and recover damages for Thermo Fisher's breaches of contract.

## CLAIMS FOR RELIEF

### Count 1 – Copyright Infringement (17 U.S.C. § 101 et seq.)

66. Axoniq incorporates by reference each of the allegations in the preceding paragraphs of this Complaint as though fully set forth herein.

67. The Berne Convention for the Protection of Literary and Artistic Works ("Berne Convention") requires member states, including the United States, to recognize the copyrights in works created in other member states. Article 2 of the Berne Convention provides that the Berne Convention applies to written works.

68. The source code for the Axon Products need not be registered with the United States Copyright Office in order to be eligible for protection under the Copyright Act as applicable here through the Berne Convention.

69. Axoniq is the legal and beneficial owner of the unregistered foreign copyrights in the source code of the Axon Products, pursuant to the law of the

Netherlands. Axoniq has all rights, title, and interest in the unregistered foreign copyrights in the source code of the Axon Products.

70. Axoniq undertook the effort, expense, time, and energy to develop and create the unique and original computer programs Axoniq Framework, Axon Server, Platform Client, and Axoniq Insights at its offices in the Netherlands, resulting in the creation of specific and original computer source codes in or around 2017 that support the Axon Products.

71. Under the law of the Netherlands, copyright protection subsists from the time the developed source codes were created into a fixed form or medium.

72. The source codes for the Axon Products are original literary works that have been fixed in a tangible medium of expression and constitute copyrightable subject matter within the meaning of Section 102 of the Copyright Act, 17 U.S.C. § 102.

73. Axoniq has the exclusive right to reproduce, distribute, display, and prepare derivative works from the Axon Products source code, and to authorize others to exercise those rights, as provided in 17 U.S.C. § 106.

74. Neither Axoniq nor any other person or entity authorized by Axoniq has granted any license, permission, or authorization to Thermo Fisher to exercise any of the rights set forth in this Complaint—outside of use for "internal business operations" or in a non-production "development" environment—or to authorize others to exercise such rights with respect to the copyrighted Axon Products or any other works in which Axoniq owns copyrights.

75. By virtue of its unauthorized and unlicensed use of the Axon Products source code, including by implementing this software outside of the development-only environment, Thermo Fisher has infringed Axoniq's copyrights.

76. Such infringement includes the unlawful reproduction, distribution, and preparation of derivative works based on the Axon Products source code, in violation of Axoniq's rights under 17 U.S.C. § 106.

77. Thermo Fisher's infringement of Axoniq's copyrights was, and continues to be, knowing, deliberate, and willful, undertaken with notice and full knowledge of Axoniq's copyrights in the Axon Products, including after receipt of the March 11 Notice, the follow-up notices of March 18 and March 24, 2026, and the August 7 Letter, and in reckless disregard of Axoniq's rights.

78. Axoniq is entitled to damages accruing from 2021 through the present in an amount to be proven at trial, including actual damages and Thermo Fisher's profits attributable to the infringement under 17 U.S.C. § 504(b).

79. Thermo Fisher's infringement of Axoniq's exclusive rights has also caused Axoniq irreparable injury. *See Tradescape.com v. Shivaram*, 77 F. Supp. 2d 408, 410 (S.D.N.Y. 1999) ("Copyright infringement is presumed to give rise to such harm."); *Merkos L'Inyonei Chinuch, Inc. v. Otsar Sifrei Lubavitch, Inc.*, 312 F.3d 94, 96 (2d Cir. 2002) ("We have held that generally when a copyright plaintiff makes out a prima facie showing of infringement, irreparable harm may be presumed.") (internal quotations omitted).

80. Unless restrained and enjoined, Thermo Fisher will continue to commit such acts. Axoniq has suffered an injury for which there is no adequate remedy at law, entitling Axoniq to remedies including injunctive relief as provided by 17 U.S.C. § 502, and an order impounding or destroying any and all infringing materials pursuant to 17 U.S.C. § 503.

**Count 2 – Violation of the Digital Millennium Copyright Act (DMCA) – Circumvention of Copyright Protection Systems (17 U.S.C. § 1201(a)(1)(A))**

81. Axoniq incorporates by reference each of the allegations in the preceding paragraphs of this Complaint as though fully set forth herein.

82. The source code of the Axon Products is subject to the protections of the Copyright Act by virtue of the Berne Convention.

83. Axoniq controls access to Axon Server and its subscription-level software through technological measures, including license-type verification and the fourteen-day evaluation limitation, and Thermo Fisher engaged in conduct to circumvent these measures, including deploying Axon Server outside of a development-only environment and repackaging it into Thermo Fisher's Genexus platform.

84. Thermo Fisher, without authority of Axoniq or the law, has intentionally and systematically circumvented the fourteen-day evaluation period and associated license controls for use of Axoniq's copyrighted software—including by repeatedly downloading new copies of the software and operating Axon Server instances that report no license ("licenseType=null")—and has exploited this software outside of the development-only environment, in violation of 17 U.S.C. § 1201(a)(1)(A).

85. A violation of the anti-circumvention rules under the DMCA is actionable even in the absence of a finding of infringement.

86. All of Thermo Fisher's acts were and are performed without the permission, license, or consent of Axoniq.

87. Thermo Fisher's circumvention of Axoniq's technological measures that control access to the use of the software outside of the development environment, as alleged above, was willful and intentional, and was executed with full knowledge of Axoniq's rights under copyright law and in disregard of those rights. Thermo Fisher has willfully infringed and, unless enjoined, will continue to willfully infringe Axoniq's copyrighted content, as set forth above, by knowingly circumventing access controls to Axoniq's copyrighted software in violation of 17 U.S.C. § 1201, *et seq*.

88. Upon information and belief, Thermo Fisher has reaped substantial monies, benefits, and/or cost savings as a result of the foregoing activities, including by evading payment of legitimate software license fees it knew it owed.

89. The wrongful acts of Thermo Fisher have caused, and are causing, injury to Axoniq, which damage cannot be accurately computed, and unless this Court restrains Thermo Fisher from the further commission of such acts, Axoniq will suffer irreparable injury, for which Axoniq is without an adequate remedy at law.

90. Axoniq is entitled to recover actual damages suffered as a result of the violation and any profits of Thermo Fisher attributable to the violation and not taken into account in computing actual damages, or at Axoniq's election, statutory damages pursuant to 17 U.S.C. § 1203(c).

91. Axoniq is entitled to recover costs and attorneys' fees from Thermo Fisher pursuant to 17 U.S.C. § 1203(b)(4) and (5).

**Count 3 – Breach of Contract – 2026 TOS**
**(New York law)**

92. Axoniq incorporates by reference each of the allegations in the preceding paragraphs of this Complaint as though fully set forth herein.

93. Thermo Fisher entered into the 2026 TOS with Axoniq, for valuable consideration, in which Axoniq provided Thermo Fisher with a non-exclusive, limited, and non-transferable license to use the Axon Products for evaluation and development use only.

94. The 2026 TOS, among other things, provides:

> "'Non-Production Use' means use of the Software solely for (a) development on local development machines, or (b) automated builds and tests, or (c) internal evaluation or debugging of Licensee's own software applications, in each case where such use does not involve processing live or real-world data and is not accessible to any end user or external party. Non-Production Use expressly excludes: (i) any use in a live, customer-facing environment; (ii) any use that directly supports business operations or generates revenue; . . . (iv) any use where the Software processes, stores, or transmits data that affects business decisions or customer experiences; and (v) any use that mirrors, replicates, supports, or receives data from a production system, regardless of how Licensee designates or labels such use internally." Exhibit A at 4.

> "If any of the following apply, you must immediately obtain the appropriate paid license subscription via AXONIQ's platform: (i) in the case of Axon Server Single Node, you wish to keep a single node active beyond 14-days under an unregistered license; or (ii) your organization no longer qualifies for a free or discounted plan based on the applicable Size Criteria." Exhibit A § 3.

> "If an audit or certification reveals that LICENSEE is using the Software contrary to the terms of this Agreement . . . LICENSEE shall be liable for: (i) all applicable commercial license fees . . . retroactive to the date of first non-compliant use . . . ; (ii) liquidated damages equal to three times (3x) such fees; (iii) interest at 1.5% per month on all amounts outstanding; and (iv) AXONIQ's reasonable attorneys' fees and costs of enforcement." Exhibit A § 15.4.

95. Thermo Fisher therefore had a duty, pursuant to the 2026 TOS, to, *inter alia*, use the Axon Products in a manner authorized by the agreement, and to neither knowingly encourage nor participate in the unauthorized use of the Axon Products.

96. Axoniq has performed all conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of the 2026 TOS.

97. Thermo Fisher knowingly and repeatedly breached the 2026 TOS between April 22, 2026, and the present by, among other things, using Axon Server and the subscription-level Axon Products beyond the fourteen-day evaluation period; using them in connection with business operations and commercial products outside of a development environment; upon information and belief, embedding the Software in its Genexus platform without an Embedded License Agreement in violation of Section 3; failing to cease use and delete all copies of the Software upon automatic termination under Section 13(a-1); and failing to obtain the appropriate paid license subscription—even after receiving multiple written notices of its non-compliance.

98. As a result of Thermo Fisher's breach of the 2026 TOS, Axoniq has been harmed and is entitled to damages in an amount to be proven at trial, including all applicable commercial license fees from Thermo Fisher's first non-compliant use, together with "liquidated damages equal to three times (3x) such fees", pursuant to Section 15.4 of the 2026 TOS, interest at 1.5% per month, pre-judgment and post-judgment interest, reasonable attorneys' fees and the costs and disbursements of this action, and all other and further relief the Court deems just and proper.

99. Section 17(b) of the 2026 TOS provides that a party "shall be entitled to seek injunctive relief against the threatened breach of this Agreement or the continuation of any such breach by the other party, without the necessity of proving actual damages or posting any bond." Thermo Fisher's acts have irreparably damaged and will continue to irreparably damage Axoniq, which has no adequate remedy at law. The damage to Axoniq includes harm to its goodwill and reputation in the marketplace that money cannot compensate. Axoniq is therefore entitled to a permanent injunction restraining and enjoining Thermo Fisher and its agents, servants, and employees, and all persons acting thereunder, in concert with, or on their behalf, from using, registering, or transferring the Axon Products without a license, or any colorable imitation or variation thereof.

**Count 4 – Breach of Contract – 2025 TOS**
**(New York law)**

100. Axoniq incorporates by reference each of the allegations in the preceding paragraphs of this Complaint as though fully set forth herein.

101. Thermo Fisher entered into the 2025 TOS with Axoniq, for valuable consideration, in which Axoniq provided Thermo Fisher with a non-exclusive, limited, and non-transferable license to use the Axon Products for evaluation and development use only.

102. The 2025 TOS, among other things, provides:

> "'Non-Production Purposes' means use (a) in development environments (local development machines) and automated build/tests and (b) for internal evaluation, development or automated testing. Non-Production Purposes explicitly exclude: (i) any use in a live, customer-facing environment; (ii) any use that directly supports business operations or generates revenue; . . . and (iv) any use where the Software processes, stores, or transmits data that affects

> business decisions or customer experiences. In case of Axon Server Single Node, Non-Production Purposes also include keeping a single node active for more than 14 days." Exhibit B at 3.
>
> "If you wish to use the Software for Production and/or, in the case of Axon Server Single Node, if you wish to keep a single node active for more than 14 days, you must go to AXONIQ's platform and sign up for the appropriate paid license subscription. This license terminates automatically if you breach these terms." Exhibit B § 3.
>
> "Unauthorized production use of Software licensed under Non-Production Free License may result in: (i) immediate liability for all applicable commercial license fees . . . from first unauthorized use; (ii) liquidated damages equal to 3x such license fees; (iii) interest at 1.5% per month; and (iv) reasonable attorneys' fees and costs of enforcement." Exhibit B § 15a(c).

103. Thermo Fisher therefore had a duty, pursuant to the 2025 TOS, to, *inter alia*, use the Axon Products in a manner authorized by the agreement, and to neither knowingly encourage nor participate in the unauthorized use of the Axon Products.

104. Axoniq has performed all conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of the 2025 TOS.

105. Thermo Fisher knowingly and repeatedly breached the 2025 TOS between October 2025 and April 22, 2026, by, among other things, using Axon Server and the subscription-level Axon Products beyond the fourteen-day evaluation period; using them in connection with business operations and commercial products outside of a development environment; failing to cease use and delete all copies of the Software upon automatic termination under Section 13(a-1); and failing to obtain the appropriate paid license subscription—even after receiving multiple written notices of its non-compliance.

106. As a result of Thermo Fisher's breach of the 2025 TOS, Axoniq has been harmed and is entitled to damages in an amount to be proven at trial, including all applicable commercial license fees from Thermo Fisher's first non-compliant use, together with "liquidated damages equal to 3x such license fees", pursuant to Section 15a(c) of the 2025 TOS, interest at 1.5% per month, pre-judgment and post-judgment interest, reasonable attorneys' fees and the costs and disbursements of this action, and all other and further relief the Court deems just and proper.

107. Section 17(b) of the 2025 TOS provides that a party "shall be entitled to seek injunctive relief against the threatened breach of this Agreement or the continuation of any such breach by the other party, without the necessity of proving actual damages or posting any bond." Thermo Fisher's acts have irreparably damaged and will continue to irreparably damage Axoniq, which has no adequate remedy at law. The damage to Axoniq includes harm to its goodwill and reputation in the marketplace that money cannot compensate. Axoniq is therefore entitled to a permanent injunction restraining and enjoining Thermo Fisher and its agents, servants, and employees, and all persons acting thereunder, in concert with, or on their behalf, from using, registering, or transferring the Axon Products without a license, or any colorable imitation or variation thereof.

## Count 5 – Breach of Contract – Breach of the Implied Covenant of Good Faith and Fair Dealing (New York law)

108. Axoniq incorporates by reference each of the allegations in the preceding paragraphs of this Complaint as though fully set forth herein.

109. In entering into the Terms of Service described above, the parties were obligated to act in good faith and to deal fairly with one another in interpreting and complying with the Terms of Service.

110. Thermo Fisher breached the implied covenant of good faith and fair dealing in both the 2026 TOS and the 2025 TOS by, among other things, (1) repeatedly downloading new copies of Axoniq's software to obtain continued access to subscription-level features of Axon Server beyond the evaluation period, (2) operating Axon Server instances without any license, (3) implementing the Axon Products in commercial products and business operations outside of the development environment, and (4) ignoring Axoniq's repeated notices and, once its legal department was engaged, delaying resolution under the guise of internal "review" while continuing its unlicensed use.

111. Each of these actions by Thermo Fisher, if not expressly prohibited by the Terms of Service, was a discretionary act that breached implicit promises within the Terms of Service, frustrated the purpose of the Terms of Service in a manner not contemplated at the time the Terms of Service were entered into, and deprived Axoniq of the benefit of the bargain under the Terms of Service.

112. By reason of the foregoing, Axoniq has no adequate remedy at law to redress the injuries that Thermo Fisher has caused and intends to cause by its conduct. Axoniq has also been damaged in an amount not presently known but to be proven at trial.

**Count 6 – Unjust Enrichment**
**(New York law)**

113. Axoniq incorporates by reference each of the allegations in the preceding paragraphs of this Complaint as though fully set forth herein.

114. Axoniq has invested substantial time and resources in developing the Axon Products.

115. Thermo Fisher has been unjustly enriched by receiving substantial benefits at Axoniq's expense through its wrongful conduct, including the use of Axon Server and the subscription-level Axon Products in its business and its Genexus platform. Thermo Fisher has not paid Axoniq any remuneration whatsoever.

116. It would be unjust and against good conscience for Thermo Fisher to retain any value it obtained as a result of its wrongful conduct.

117. By reason of the foregoing, Axoniq has no adequate remedy at law to redress the injuries that Thermo Fisher has caused and intends to cause by its conduct. Axoniq has also been damaged in an amount not presently known but to be proven at trial.

**Count 7 – Unfair Competition**
**(New York General Business Law § 349)**

118. Axoniq incorporates by reference each of the allegations in the preceding paragraphs of this Complaint as though fully set forth herein.

119. New York General Business Law § 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service . . . ."

120. Subsection (h) of General Business Law § 349 provides that "any person who has been injured by reason of any violation of this section may bring an action . . . to enjoin such unlawful act or practice . . ." in addition to the right to recover "actual damages."

121. Axoniq has invested substantial time and resources in developing the Axon Products.

122. Thermo Fisher, through its unauthorized use of the Axon Products in commercial products and business operations, outside of the development environment, has been and is engaging in acts of unfair competition, unlawful appropriation, unjust enrichment, wrongful deception of its public end-users, and unlawful trading on Axoniq's copyrighted works—all of which has caused Axoniq irreparable harm for which Axoniq has no adequate remedy at law.

123. Thermo Fisher's conduct is and has been willful, intentional, and purposeful, and in knowing and conscious disregard of the rights of Axoniq.

124. As a direct and proximate result of Thermo Fisher's willful and wanton conduct and violations of New York General Business Law § 349 and the common law, Axoniq is entitled to treble damages and its costs and reasonable attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Axoniq respectfully requests judgment in its favor and against Thermo Fisher as follows:

A. Finding that Thermo Fisher has infringed Axoniq's copyrights in the Axon Products;

B. Finding that Thermo Fisher's infringement of Axoniq's copyrights was willful;

C. Issuing a permanent injunction enjoining Thermo Fisher, its agents, servants, employees, attorneys, successors, and assigns, and all persons, firms and corporations acting in concert with them, from directly or indirectly infringing Axoniq's copyrights in the Axon Products;

D. Issuing a permanent injunction providing that Thermo Fisher shall immediately remove all copies of the Axon Products from its systems, or immediately obtain a license from Axoniq for their use;

E. Awarding actual damages for copyright infringement;

F. Awarding liquidated damages under the 2025 and 2026 Terms of Service for Thermo Fisher's breach of contract;

G. Awarding statutory damages for Thermo Fisher's violations of the DMCA, pursuant to 17 U.S.C. § 1203;

H. Awarding costs, pursuant to 17 U.S.C. § 1203;

I. Awarding reasonable attorneys' fees, pursuant to 17 U.S.C. § 1203 and the 2025 and 2026 Terms of Service;

J. Awarding pre-judgment and post-judgment interest, to the fullest extent available; and

K. Awarding other, further and different relief as the Court deems just and proper.

**JURY DEMAND**

Axoniq demands trial by jury on all issues triable to a jury.

Dated: New York, New York

November 25, 2026

HAYNES AND BOONE, LLP

By: */s/ Raquel O. Alvarenga*

Raquel O. Alvarenga
NY Bar No. 5170428
raquel.alvarenga@haynesboone.com
30 Rockefeller Plaza, 22nd Floor
New York, New York 10112
Telephone: (212) 659-7300

Heather C. Barger (*pro hac vice* application forthcoming)
heather.barger@haynesboone.com
Mitchell Alleluia-Feinberg (*pro hac vice* application forthcoming)
mitchell.alleluia-feinberg@haynesboone.com
Mishan A. Kara (*pro hac vice* application forthcoming)
mishan.kara@haynesboone.com
2801 N. Harwood Street, Suite 2300
Dallas, Texas 75201
Telephone: (214) 651-5000

*Attorneys for Plaintiff, Axoniq B.V.*